## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GARRETT TRAYLOR, *individually, and on behalf of others similarly situated,*<br><br>    *Plaintiff,*<br><br>    v.<br><br>LIVEFREE EMERGENCY RESPONSE, INC.,<br><br>    Defendant. | Civil Case No.:  1:24-cv-10329<br><br>CLASS-ACTION<br><br>**Jury Trial Demanded** |

## CLASS ACTION COMPLAINT

COMES NOW Plaintiff Garrett Traylor ("Plaintiff" or "Traylor"), individually, and on behalf of all others similarly situated, and for his Class-Action Complaint against Defendant LiveFree Emergency Response, Inc. ("Defendant" or "LiveFree"), states as follows:

### BACKGROUND ON THE TCPA

1.      Plaintiff Traylor brings this class-action lawsuit against Defendant LiveFree for unlawful telemarketing calls in violation of various provisions of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA").

2.      In 1991, after passage with bipartisan support in Congress, President George H.W. Bush signed the TCPA into law, to protect consumers' consumers' privacy and the right to be left alone from unwanted telemarketing calls.

3.      A leading sponsor of the TCPA described unwanted telemarketing calls as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

4.      Traylor alleges Defendant placed telemarketing calls to Traylor and the putative class members despite: (1) placing calls to cell phones and residential wireline phones that utilized a pre-recorded voice, not having received prior express written consent to place such calls; (2)

Traylor's and the putative class members phone numbers being registered on the National Do-Not-Call Registry ("DNC List"), and, (3) Traylor and the putative class members requesting that Defendant stop calling them.

5.      In 2023 alone, approximately 55 billion robocalls were placed in the United States. RobocallIndex.com, YouMail Robocall Index, https://robocallindex.com/history/time (last visited February 6, 2024). The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. For example, while the Federal Communications Commission levied over $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount. *See* Sarah Krouse, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790*, THE WALL STREET JOURNAL, March 28, 2019, https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

6.      Traylor seeks to represent putative class members who (1) received robocalls using a pre-recorded voice on a residential wireline phone or cell phone without the caller first obtaining the called parry's "prior express written consent"; (2) are residential subscribers (i.e. individuals rather than businesses) who received two or more telemarketing calls from LiveFree after registering their numbers on the Federal DNC List; and (3) who received telemarketing calls after requesting to no longer be called (i.e. to be placed on a company's internal DNC List).

## PARTIES

7.      Traylor is an individual who at all times material to this Complaint resided in Westwood, Massachusetts.

8.      Plaintiff is a "person" as that term is defined by 47 U.S.C. §153(39).

9.      Defendant LiveFree is Delaware corporation with its principle place of business located at 3411 Hawthorne Road, Pocatello, Idaho 83021.

10.     Defendant is a "person" as that term is defined by 47 U.S.C. §153(39).

11.     Defendant is in the business of selling mobile medical alert systems.  These systems can be used to provide an alert that someone has fallen.

12.     One of Defendant's products has the brand name "LifeBeacon." The LifeBeacon product has a fall detection system that can automatically send an alert if the person who has fallen is unable to manually send an alert.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States. See *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (confirming that 28 U.S.C. § 1331 grants the United States district courts federal-question subject-matter jurisdiction to hear private civil suits under the TCPA).

14.     Defendant LiveFree systematically and continuously conducts business in the Commonwealth of Massachusetts.

15.     Furthermore, Defendant knowingly and purposefully availed itself to the Commonwealth of Massachusetts when it called Plaintiff on his "617" and "781" area code phone numbers, which are associated with Massachusetts.

16.     Additionally, Defendant used "617" area code to call Plaintiff.

17.     Plaintiff experienced the harms associated with his claims while present in Massachusetts.

3

18.     For those reasons, this Court has general and specific personal jurisdiction over the parties to this action, and venue is proper pursuant to 28 U.S.C. §1391(b)(2).

## FACTUAL BACKGROUND
## LIVEFREE'S TELEMARKETING CAMPAIGN TO TRAYLOR:

19.     At all times relevant to this Complaint, Traylor was the owner of a traditional landline telephone. The phone number associated with Traylor's landline telephone is 781-XXX-1986.

20.     To protect his privacy interests and, more specifically, to avoid being inundated with unwanted telemarketing calls, Traylor placed his traditional landline number on the national Do Not Call Registry ("DNC List") on August 16, 2003.

21.     At all times relevant to this Complaint, Traylor was also the owner of a cellular telephone. The phone number associated with Traylor's cell phone is 617-XXX-0277.

22.     To protect his privacy interests and, more specifically, to avoid being inundated with unwanted telemarketing calls, Traylor placed his cell phone number on the DNC List on October 11, 2018.

23.     The accounts for Traylor's landline and cell phone associated with these numbers are held in Traylor's personal name and not in the name of a business.

24.     Traylor uses both phones primarily for personal and household purposes, including communicating with friends and family members.

25.     At all relevant times, Defendant LiveFree's website was www.lifebeacon.com.

26.     Defendant's aforementioned website states LiveFree has a "dealer network that extends throughout the United States and Canada."

27.     Defendant markets its products and services through telemarketing.

28.     On February 27, 2020, Defendant placed a call to Traylor's 617 area code phone

number.  The phone number that appeared on Traylor's phone also had a 617-area code.

29.    On information and belief, Defendant spoofed the phone number to make the incoming call appear as though it originated from Traylor's same area code so that Traylor would be more likely to answer the phone.

30.    Upon answering the phone, Traylor heard a prerecorded message which stated:

Hello. This is Amy with medical services. You were recently recommended by a medical professional to receive an emergency medical alert system at no cost to you and your system is ready to be shipped. Press one now to hold the line to receive your medical alert system at no cost.

31.    Traylor could tell the message was pre-recorded because the tone and cadence was unnatural, spoke without pause and was non-interactive.

32.    As the recording did not identify an actual company name, Traylor pressed one to "hold the line" and speak with a live person, who could identify the company calling.

33.    Upon pressing the number one, another prerecorded played. The prerecorded message stated, "One in three Americans over the age of 65 fall every year in the U.S., and it could be the last. Don't be a statistic. Press one now and hold the line to receive your no cost medical alert system. Press one now. Press nine to opt out."

34.    As the recording still did not identify an actual company name, Traylor again pressed one to "hold the line."

35.    Upon pressing one, another prerecorded voice was on the other line.  This voice, however, utilized "soundboard" voice technology (also known as "avatar" technology). Soundboard technology is where a pre-recorded clips of human voices are played in response to human prompts to simulate an interaction with a live person.

36.    The recorded voice on the other line informed Traylor he had been selected to receive a medical alert system.

37.    Traylor could tell it was soundboard technology on the other line, because the voice was unnatural and computerized.

38.    The soundboard or avatar voice asked Traylor a series of questions, which Traylor answered for the purpose of determining who was calling him.

39.    The avatar said that the cost to Traylor would be a cost of $39.99 a month for the monthly monitoring which was "the lowest price in the country for this product."

40.    The avatar was not a live human as the prerecorded voice continued to repeat the same phrase unnaturally. For example, the avatar responded unnaturally to Traylor with the phrase "Don't worry – everything is going to be ok.  We are in the business of protecting senior citizens."

41.    On May 8, 2020, Traylor received a similar call on his 617 number. Like the previous call, the phone number that appeared on Traylor's phone also had a 617-area code.

42.    On information and belief, Defendant spoofed the phone number to make the incoming call appear as though it originated from Traylor's same area code so that Traylor would be more likely to answer the phone.

43.    Traylor again heard the same prerecorded voice. The prerecorded voice again stated in part, "One in three Americans over the age of 65 fall every year in the U.S., and it could be the last. Don't be a statistic. Press one now and hold the line to receive your no cost medical alert system. Press one now. Press nine to opt out."

44.    The avatar again said that the cost to Traylor would be a cost of $39.99 a month for the monthly monitoring which was "the lowest price in the country for this product."

45.    Traylor was eventually connected with a live representative. The live representative gave Traylor a customer support number of 813-492-8627.

46.    Upon calling the phone number 813-492-8627, Traylor was eventually connected

with a live representative named "Tina" with "medical alert." "Tina" identified the name of the product was "Life Beacon" and that their website was www.lifebeacon.com.

47.    On May 21, 2020, Traylor received another similar call on his 617 number. Like the previous calls, a prerecorded message again stated, "Hello. This is Amy with medical services. You were recently recommended by a medical professional to receive an emergency medical alert system at no cost to you and your system is ready to be shipped. Press one now to hold the line to receive your medical alert system at no cost."

48.    On information and belief, Defendant spoofed the phone number to make the incoming call appear as though it originated from Traylor's same area code so that Traylor would be more likely to answer the phone.

49.    As the recording did not identify an actual company name, Traylor pressed one to "hold the line."

50.    Upon pressing the number one, another prerecorded played. The prerecorded message again stated, "One in three Americans over the age of 65 fall every year in the U.S., and it could be the last. Don't be a statistic. Press one now and hold the line to receive your no cost medical alert system. Press one now. Press nine to opt out."

51.    Traylor again pressed one to determine who was calling him.

52.    Traylor was then connected with another avatar with a similar, if not identical voice and asked the same questions as the avatar on the previous calls and again tried to sell Traylor a medical alert system.

53.    The avatar again said that the cost to Traylor would be a cost of $39.99 a month for the monthly monitoring which was "the lowest price in the country for this product."

54.    On June 9, 2020, Defendant placed another call to Traylor's 617 area code phone

number.  The phone number that appeared on Traylor's phone also had a 617-area code.

55.     On information and belief, Defendant spoofed the phone number to make the incoming call appear as though it originated from Traylor's same area code so that Traylor would be more likely to answer the phone.

56.     Upon answering the phone, a prerecorded voice again stated, "Hello. This is Amy with medical services. You were recently recommended by a medical professional to receive an emergency medical alert system at no cost to you and your system is ready to be shipped. Press one now to hold the line to receive your medical alert system at no cost."

57.     As the recording did not identify an actual company name, Traylor pressed one.

58.     Upon pressing the number one, another prerecorded played. The prerecorded message stated, "One in three Americans over the age of 65 fall every year in the U.S., and it could be the last. Don't be a statistic. Press one now and hold the line to receive your no cost medical alert system. Press one now. Press nine to opt out."

59.     As the recording still did not identify an actual company name, Traylor again pressed one to "hold the line."

60.     Traylor was then connected with the same avatar/soundboard voice to whom he was connected on the previous calls.

61.     On November 3, 2021, Traylor began receiving calls from Defendant on his 781-phone number. The phone number that appeared on Traylor's phone also had a 781-area code.

62.     On information and belief, Defendant spoofed the phone number to make the incoming call appear as though it originated from Traylor's same area code so that Traylor would be more likely to answer the phone.

63.     Upon answer the call, Traylor received heard the same prerecorded message, which

again stated, "Hello. This is Amy with medical services. You were recently recommended by a medical professional to receive an emergency medical alert system at no cost to you and your system is ready to be shipped. Press one now to hold the line to receive your medical alert system at no cost."

64.    Upon pressing the number one, another prerecorded played. The prerecorded message again stated, "One in three Americans over the age of 65 fall every year in the U.S., and it could be the last. Don't be a statistic. Press one now and hold the line to receive your no cost medical alert system. Press one now. Press nine to opt out."

65.    As with the previous calls, Traylor was then connected to an avatar with an identical voice who asked identical questions.

66.    On December 9, 2021, Traylor received another call from Defendant on his 781-phone number. The phone number that appeared on Traylor's phone was again a 781 number.

67.    On information and belief, Defendant spoofed the phone number to make the incoming call appear as though it originated from Traylor's same area code so that Traylor would be more likely to answer the phone.

68.    Traylor received numerous other calls from Defendant on his 781-phone number as originating from a 781-area code. These calls were placed to Traylor on the following dates in 2021: December 10, 13, 14, and 15. These calls were placed to Traylor on the following dates in 2022: January 24, 25, 31; February 1, 7, 10, 18, 24; March: 8, 22, 31; April: 6.  These calls were placed to Traylor on the following dates in 2023: March 27 and May 15 (the calls in this paragraph are collectively referred to as the "other calls").

69.    Traylor also received another call from Defendant on his 617 number (again from a 617-area code) on February 10, 2023 (also included in the "other calls").

70.     On information and belief, Defendant spoofed the phone numbers to make the incoming calls appear as though it originated from Traylor's same area code so that Traylor would be more likely to answer the phone.

71.     The majority of these other calls included the same or a similar prerecording as Traylor heard with the previous calls and the same or similar avatar.

72.     The representative on many of these other calls also often identified a product called "LifeBeacon" and that the company was located in Pocatello, Idaho.

73.     Not only did Defendant incessantly place telemarketing calls to Traylor, it did so after Traylor repeatedly asked Defendant, in writing to stop calling him.

74.     On April 19, 2022 and April 1, 2023, Traylor requested, in writing, that Defendant stop calling him.  Yet, Traylor received calls on his 781 number on March 27, 2023 and May 15, 2023.

75.     On information and belief, Defendant placed similar calls to the putative class members as it did to Traylor.

76.     The purpose of each of Defendant's calls to Traylor and the putative class members was to attempt to get Traylor and the putative class members to purchase Defendant's products and services.

77.     Traylor did not provide Defendant "prior express written consent" (As defined in 47 C.F.R. § 64.1200(f)(9) or any other form of consent to Defendant to place prerecorded voice calls, or any other types of calls to his phone.

78.     Traylor had not heard of Defendant's company before receiving the aforementioned unsolicited calls.

79.     Traylor was not in the market for medical alert devices when he began receiving

the incessant telemarketing calls from Defendant.

80.    On information and belief, Defendant knew that it should not have called Traylor and the putative class members, yet incessantly attempted to call them.

81.    The phone calls Defendant placed to Traylor and the putative class members were harassing, irritating, invasive and annoying.

82.    Defendant's phone calls invaded Traylor's and the putative class members' right to privacy, namely the right to be left alone from unwanted telemarketing calls.

83.    Defendant's phone calls caused Traylor and the putative class members to waste time and be disrupted from their daily activities, addressing and/or responding to the unwanted calls.

## DIRECT AND VICARIOUS LIABILITY

84.    Where LiveFree is the only party that disclosed its identity in calls that Plaintiff answered, Traylor understands and therefore alleges LiveFree is directly liable for the unlawful calls.

85.    However, if discovery reveals that some or all of the calls were made by third-party/parties on behalf of Defendant, then Defendant is vicariously liable for those calls.

86.    On May 9, 2013, the FCC determined that this was not a basis for avoiding liability within a Declaratory Ruling that held that sellers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside of the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies)

11

would be required to sue each marketer separately in order to obtain relief. As the FTC noted, because "[s]ellers may have thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re: Dish Network, LLC,* 28 F.C.C. Rcd. 6574 at 6588 (May 9, 2013) (internal citations omitted).

87.    Moreover, the May 2013 FCC ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal actual agency and immediate direction and control over third parties who place a telemarketing call. *Id.* at 6587 n. 107.

88.    The evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.,* at 6593.

89.    If Defendant directly placed the calls at issue to Traylor, Defendant is directly liable for those calls.

90.    However, Defendant may have hired, encouraged, permitted, and enjoyed the benefits of mass telemarketing by third-party telemarketers that are currently unknown to Traylor and only known to Defendant.

91.    In the event Defendant hired third-party telemarketers to place calls on its behalf, those telemarketers had actual and/or apparent authority to act on behalf of Defendant.

92.    Likewise, Defendant also ratified its agents' violations of the TCPA by accepting leads and deriving profit from sales imitated by unlawful robocalls.

93.    Defendant controlled or had the right to control the marketing activities of those acting on its behalf. Among other things, the calls received from Traylor were similar in that they used a similar prerecording and artificial/avatar voice script which asked similar questions.

94.     Defendant acted as a principal to telemarketing agent(s) whose identity or identities are unknown at this time.

95.     Defendant is not permitted under the law to outsource and contract its way out of liability by directing and benefitting from its agents' TCPA violations.

96.     For the counts identified below, if Defendant directly placed the call(s), it is directly liable. In the alternative, to the extent any call(s) were made by a third-party agent(s) acting on Defendant's behalf, Defendant is vicariously liable for those unlawful calls.


**CLASS ALLEGATIONS**

97.     Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), Traylor brings this Complaint as a class action on behalf of him and all others similarly situated. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation.

98.     Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3), Traylor seeks to represent the following classes:

> **Prerecorded Voice Call Class:** All persons in the United States who from four years prior to the filing of this action through the date a class is certified to whom Defendant (or someone acting on its behalf) placed a prerecorded or artificial voice call to the recipient's cell phone or residential wireline phone.

> **DNC List Class:** All persons in the United States who from four years prior to the date of the filing of this lawsuit until the date of class certification: (1) to whom Defendant (or someone acting on its behalf) placed two or more calls during a 12-month period; (2) where the calls were made in connection with a campaign to solicit Defendant's products or services; and, (3) whose number was registered on the DNC List for more than 31 days at the time the calls were received; (4) where the phone number is registered to an individual, rather than a business.

> **Internal Do-Not-Call Class:** All persons in the United States who from four years prior to the filing of this action through the date a class is certified: (1) Defendant (or someone acting on its behalf) called more than one time, (2) within any 12-month period, (3) marketing products and

services, and, (4) after the person requested that Defendant stop calling.

99.    Traylor reserves the right to add administrative subclasses, or to amend the definition of the proposed class, during the lawsuit proceedings.

100.    The members of the proposed classes are so numerous that joinder of all members is impracticable. Traylor reasonably believes that hundreds or thousands of people have been harmed by Defendant's actions. The names and phone numbers of the members of the proposed class are readily identifiable through records available to Defendant or those acting on its behalf.

101.    Members of the proposed class have suffered damages in an amount such that it would make filing separate lawsuits by individual members economically infeasible.

102.    On information and belief, Defendant has called and continues to place prerecorded voice calls to people without the appropriate form of consent and to people who have requested to be placed on Defendant's internal do not call list. It is reasonable to expect that Defendant will continue to make such calls absent this lawsuit.

103.    Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to:

   a.   Whether the voice technology used by Defendant constitutes a "pre-recorded voice" as defined by 47 U.S.C. § 227(b) of the TCPA;

   b.   Whether Defendant's conduct violates 47 U.S.C. § 227(b) of the TCPA;

   c.   Whether the calls at issue qualify as "telephone solicitations" for the purposes of 47 U.S.C. § 227(c);

   d.   Whether Defendant's conduct violates 47 U.S.C. § 227(c) of the TCPA;

   e.   If Defendant hired third-party vendor(s) to telemarket on its behalf, whether an agency relationship exists between Defendant and said vendor(s);

   f.   If Defendant hired third-party vendor(s) to telemarket on its behalf, whether Defendant "ratified" any violations of its vendor(s);

g.  Whether Defendant's manner and system of obtaining consumer "consent" was legally deficient;

h.  Whether Defendant implemented policies and procedures for TCPA compliance that would warrant the "good faith safe harbor" prescribed by 47 C.F.R. § 64.1200(c);

i.  Whether Defendant's conduct violates the rules and regulations implementing the TCPA; and

j.  Whether Traylor and the putative class members are entitled to increased damages for each violation based on the willfulness of Defendant's conduct.

104.    Traylor's claims are typical of the claims of the proposed class members because his claims arise from the same practice that gives rise to the claims of the members of the proposed class and is based on the same legal theories.

105.    Traylor and his counsel will fairly and adequately protect the interests of the members of the proposed class. Traylor's interests do not conflict with the interests of the proposed class he seeks to represent. Traylor has retained lawyers who are competent and experienced in consumer litigation, the TCPA and class-actions.

106.    Traylor's counsel will vigorously litigate this case as a class action, and Traylor and his counsel are aware of their responsibilities to the putative members of the class and will discharge those duties.

107.    A class action is superior to all alternative methods of adjudicating this controversy, including through individual lawsuits. Joinder of all proposed members of the proposed class in one action is impracticable if not impossible and prosecuting hundreds or thousands of individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For members of the proposed class, a class action is the only procedural mechanism that will allow recovery. Even if members of the proposed class had the

resources to pursue individual litigation, that method would be unduly burdensome to the courts. Individual litigation could also result in inconsistent adjudications.

108.    In contrast, a class action is superior in that it will benefit the court and litigating parties through efficiency, economy of scale and unitary adjudication resulting from supervision of the litigation by a single court.

109.    Questions of law and fact, particularly the propriety of placing prerecorded voice calls and calling people who request no longer to be called, predominate over questions affecting only individual members.

110.    Defendant has acted or refused to act on grounds that apply generally to the class, making final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

**COUNT I**
**Violations of the TCPA, 47 U.S.C. § 227(b)** *et seq.*
**(Prerecorded Voice Violations – Individually and on Behalf of the Putative Class)**

111.    Traylor incorporates the allegations in the previous paragraphs as if fully stated in this Count.

112.    The TCPA states, in relevant part, "It shall be unlawful . . . (A) to make any call . . . using [a] prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone . . . ." 47 U.S.C. § 227(b)(1).

113.    A prerecorded voice telemarketing call cannot be placed to a recipient without first obtaining the recipient's "prior express written consent." 47 C.F.R. § 64.1200(a)(2).

114.    The term "prior express written consent" means "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone

dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. § 64.1200(f)(9)(i).

115.    Traylor and the putative class members did not provide "prior express written consent" as that term is defined in 47 C.F.R. § 64.1200(f)(9), for Defendant to contact them on their phones.

116.    The calls placed by Defendant to Traylor and the putative class members were telemarketing calls because those calls encouraged the purchase of Defendant's products and/or services.  47 C.F.R. § 64.1200(f)(9)(i).

117.    By placing calls to the phones of Traylor and the putative class members without first obtaining their prior express written consent, Defendant violated the express provisions of the TCPA, including, but not limited to, 47 U.S.C. § 227(b)(1).

118.    The TCPA provides damages of $500 and up to $1,500 per violation. 47 U.S.C. § 227(b)(3).

119.    Defendant violated the Section 227(b) of the TCPA by placing the aforementioned prerecorded voice calls to Traylor's phones.

120.    Defendant knew or should have known it did not have the appropriate form of consent to contact Traylor and the putative class members yet continued to call them.

121.    Traylor and the putative class members are each entitled to $500 per violation of Section 227(b) of the TCPA, and up to $1,500.00 for every violation determined to be willful.

WHEREFORE Plaintiff Garrett Traylor, individually, and on behalf of all others similarly situated, requests the Court grant the following relief in his favor and against Defendant LiveFree Emergency Response, Inc.:

A.  Enter an order against Defendant, pursuant to Federal Rule of Civil Procedure 23, certifying this action as a class action and appointing Traylor as the class representative;

B.  Enter an order appointing Butsch Roberts & Associates LLC and Kimmel and Silverman. P.C. as class counsel;

C.  Enter judgment in favor of Traylor and the putative class for all damages available under the TCPA, including statutory damages of $500 per violation, and up to $1,500 per violation if Defendant willfully violated Section 227(b) of the TCPA and/or the applicable TCPA regulations;

D.  Enter a judgment in favor of Traylor and the Prerecorded Voice Call Class members that enjoins Defendant from violating the TCPA's regulations prohibiting Defendant from placing prerecorded voice calls without first obtaining the proper form of consent;

E.  Award Traylor and the class all expenses of this action, and requiring Defendant to pay the costs and expenses of class notice and administration;

F.  Award all applicable pre- and post-judgment interest and court costs; and,

G.  Award Traylor and the class such further and other relief the Court deems just and appropriate.

### COUNT II
### Violations of the TCPA, 47 U.S.C. § 227(c) *et seq.*
### (National DNC List Violations – Individually, and on Behalf of The Putative Class)

122.    Traylor incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

123.    The TCPA provides that is a violation of the law for a person whose phone number is registered on the National Do Not Call Registry to receive more than one call on their phone "within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. §§ 227(c)(1), (c)(5); 47 C.F.R. § 64.1200(c)(ii).

124.    The penalty for each call placed in violation of the TCPA's restrictions on calling phone numbers registered on the DNC List is up to $500 per call and up to $1,500 per call if the violation is determined to be willful. *See* 47 U.S.C. § 227(c)(5).

125.    In addition, the TCPA allows the Court to enjoin Defendant's violations of the TCPA's regulations prohibiting calls to phone numbers registered on the DNC List. *See* 47 U.S.C. §§ 227(c)(5)(A).

126.    By making calls to Traylor and the putative class members' phone numbers, which were registered on the DNC List, Defendant violated the TCPA, including, but not limited to, 47 U.S.C. § 227(c)(1) and/or the TCPA's corresponding regulations.

127.    Defendant or those acting on its behalf knew or should have known that Traylor's and the putative class members' phone numbers were registered on the DNC List.

128.    Defendant or those acting on its behalf willfully violated the TCPA when placing the calls to Traylor's and the putative class members' cell phones.

129.    Traylor and the putative class members are entitled to damages of up to $500.00 per violation for each call made by Defendant or those acting on its behalf that the Court finds violates the TCPA and up to $1,500.00 per violation if the Court finds that Defendant or those acting on its behalf willfully violated the TCPA.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Garrett Traylor, individually, and on behalf of all others similarly situated, requests the Court grant the following relief in his favor and against Defendant LiveFree Emergency Response, Inc.:

A.    Enter an order against Defendant, pursuant to Federal Rule of Civil Procedure 23, certifying this action as a class action and appointing Traylor as the class representative;

B.    Enter an order appointing Butsch Roberts & Associates LLC and Kimmel and Silverman. P.C. as class counsel;

C.    Enter judgment in favor of Traylor and the DNC List Class members for all damages and other relief available under the TCPA, 47 U.S.C. § 227(c), including

injunctive relief, statutory damages of $500 per violation, and up to $1,500 per violation if Defendant willfully violated the TCPA;

D.  Enter a judgment in favor of Traylor and the Class that enjoins Defendant from violating the TCPA's provisions and regulations;

E.  Enter judgment in favor of Traylor and the Class for all applicable pre-judgment and post-judgment interest amounts;

F.  Enter judgment in favor of Traylor and the Class for all costs; and,

G.  Award Traylor and the Class members such further and other relief the Court deems just and appropriate.

**COUNT III**
**Violations of the TCPA, 47 U.S.C. § 227(c)** *et seq.*
**(Internal Not-Call List Violations – Individually and on behalf of the putative class)**

130.    Traylor incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

131.    The TCPA provides that "a person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection" may recover up to $500 for each violation, and up to $1,500 for each violation, if the violation is determined to be willful. *See* 47 U.S.C. §§ 227(c)(5).

132.    The regulations prescribed under Section 227(c) require companies like Defendant, who engages in telemarketing to institute "procedures for maintaining a list of persons who request not to receive telemarketing calls on or behalf of that person or entity" (*i.e.* to be placed on the Defendant's internal do-not-call list) *See* 47 C.F.R. § 64.1200(d).

133.    These procedures must meet several minimum standards, including, but not limited to:

(1) ***Written policy.*** Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

(2) ***Training of personnel engaged in telemarketing.*** Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) ***Recording, disclosure of do-not-call requests.*** If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the telemarketing call is made, the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not-call request. A person or entity making a call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a telemarketing call is made or an affiliated entity.

(4) ***Identification of sellers and telemarketers.*** A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

(5) ***Affiliated persons or entities.*** In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

(6) ***Maintenance of do-not-call lists.*** A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made.

*See* 47 C.F.R. § 64.1200(d)(1)-(6).

134. Defendant failed to implement these minimum standards by repeatedly calling

Traylor and the putative class members after Traylor and the putative class members requested

that Defendant stop calling them.

135.    By calling Traylor and the putative class members after their numbers should have been placed on Defendant's internal do-not-call list, Defendant violated the TCPA, including, but not limited to, 47 U.S.C. § 227(c) and the TCPA's corresponding regulations.

136.    Defendant knew or should have known that Traylor and the putative class members did not wish to be called and wished to be placed on Defendant's internal do-not-call list but continued to call them.

137.    Traylor and the putative class members are each entitled to up to $500 per violation of Section 227(c) of the TCPA (Internal Do-Not-Call Registry violations only), and up to $1,500.00 for every violation determined to be willful.

WHEREFORE Plaintiff Garrett Traylor, individually, and on behalf of all others similarly situated, requests the Court grant the following relief in his favor and against Defendant LiveFree Emergency Response, Inc.:

A.    Enter an order against Defendant, pursuant to Federal Rule of Civil Procedure 23, certifying this action as a class action and appointing Traylor as the class representative;

B.    Enter an order appointing Butsch Roberts & Associates LLC and Kimmel and Silverman. P.C. as class counsel;

C.    Enter judgment in favor of Traylor and the Internal Do-Not-Call List Class members for all damages and other relief available under the TCPA, 47 U.S.C. § 227(c), including injunctive relief, statutory damages of $500 per violation, and up to $1,500 per violation if Defendant willfully violated the TCPA;

D.    Enter a judgment in favor of Traylor and the Class that enjoins Defendant from violating the TCPA's provisions and regulations;

E.    Enter judgment in favor of Traylor and the Class for all applicable pre-judgment and post-judgment interest amounts;

F.    Enter judgment in favor of Traylor and the Class for all costs; and

G.   Award Traylor and the Class members such further and other relief the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff Garrett Traylor demands a jury trial.

KIMMEL & SILVERMAN, P.C.

*Craig Thor Kimmel*
Craig Thor Kimmel, Esq.
30 East Butler Ave.
Ambler, PA 19002
Phone: (215) 540-8888 x 148
Facsimile: (877) 788-2864
Email: kimmel@creditlaw.com
teamkimmel@creditlaw.com

Jacob U. Ginsburg, Esq. (*pro hac vice* forthcoming)
30 East Butler Avenue
Ambler, PA 19002
Telephone: (267) 468-5374
Fax: (877) 788-2864
jginsburg@creditlaw.com
teamkimmel@creditlaw.com

BUTSCH ROBERTS & ASSOCIATES LLC

Christopher E. Roberts (*pro hac vice* forthcoming)
7777 Bonhomme Avenue, Suite 1300
Clayton, MO 63105
Telephone: (314) 863-5700
croberts@butschroberts.com

*Attorneys for Plaintiff*